NO. 22-1712

# United States Court of Appeals

*for the*

# Fourth Circuit

STEPHEN R. PORTER, PH.D.,

*Plaintiff-Appellant,*

– v. –

BOARD OF TRUSTEES OF NORTH CAROLINA STATE UNIVERSITY;
W. RANDOLPH WOODSON, in his official capacity; MARY ANN
DANOWITZ, in both her official and individual capacities; JOHN K. LEE,
in both his official and individual capacities; PENNY A. PASQUE, in both
her official and individual capacities; JOY GASTON GAYLES, in both
her official and individual capacities,

*Defendants-Appellees.*

ELIZABETH WEISS; PACIFIC LEGAL FOUNDATION;
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION,

*Amici Supporting Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF NORTH CAROLINA AT RALEIGH IN NO. 5:21-CV-00365-BO
HONORABLE TERRENCE W. BOYLE, U.S. DISTRICT COURT JUDGE

## BRIEF FOR DEFENDANTS-APPELLEES

JOSHUA H. STEIN
NORTH CAROLINA ATTORNEY GENERAL

KARI R. JOHNSON
SPECIAL DEPUTY ATTORNEY GENERAL
VANESSA N. TOTTEN
SPECIAL DEPUTY ATTORNEY GENERAL
NORTH CAROLINA DEPARTMENT OF JUSTICE
P.O. Box 629
Raleigh, North Carolina 27602
(919) 716-6920
kjohnson@ncdoj.gov
vtotten@ncdoj.gov

ERIC M. DAVID
BROOKS, PIERCE, MCLENDON,
    HUMPHREY & LEONARD, LLP
P.O. Box 1800
Raleigh, North Carolina 27602
(919) 573-6203
edavid@brookspierce.com

*Attorneys for Defendants-Appellees*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-1712__     Caption: __Porter v. Board of Trustees of N.C. State Univ., et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Board of Trustees of N.C. State Univ., W. Randolph Woodson, Mary Ann Danowitz, John K. Lee,__
(name of party/amicus)

__Penny A. Pasque, and Joy Gaston Gayles__

who is _____ Appellees _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
      financial interest in the outcome of the litigation?                    ☐YES ☑NO
      If yes, identify entity and nature of interest:



5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected
      substantially by the outcome of the proceeding or whose claims the trade association is
      pursuing in a representative capacity, or state that there is no such member:



6.    Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
      party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
      caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
      corporation that owns 10% or more of the stock of the debtor.



7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational
      victim of the criminal activity and (2) if an organizational victim is a corporation, the
      parent corporation and any publicly held corporation that owns 10% or more of the stock
      of victim, to the extent that information can be obtained through due diligence.



Signature: /s/ Eric M. David                              Date:      09/26/2022

Counsel for: Appellees

Print to PDF for Filing

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT

TABLE OF CASES AND AUTHORITIES ............................................................iv

STATEMENT OF THE ISSUES....................................................................1

STATEMENT OF THE CASE......................................................................1

I.    Background on the parties and the structure of the College of Education......2

II.   The communications giving rise to Plaintiff's Complaint .............................3

      A.    Communication #1 (the "Survey Methodology Comment")...............4

      B.    Communication #2 (the "Hiring Process Email")..............................5

      C.    Communication #3 (the "Conference Agenda Blog Post") .................6

III.  Faculty leaders attempt to address concerns about Porter's treatment of his
      colleagues..................................................................................7

IV.   Porter is reassigned from the Higher Education Program Area, which
      focuses on Master's students, but remains in the Ph.D. Program Area of
      Study .........................................................................................9

V.    The district court dismisses Porter's claims .................................................12

SUMMARY OF THE ARGUMENT ....................................................................13

STANDARD OF REVIEW ...............................................................................16

ARGUMENT .................................................................................................17

I.    The district court correctly held that Porter fails to allege either a
      materially adverse employment action or the required casual
      connection..................................................................................17

A.  Porter has not plausibly alleged any non-speculative, materially adverse employment action ................................................................18

B.  Porter has not plausibly alleged a "but for" casual connection between his speech and any adverse employment action ...................28

II.  Porter has not adequately pleaded the remaining elements of his claim for First Amendment retaliation ....................................................32

A.  The *Garcetti* test controls certain aspects of Porter's claim, and he fails to satisfy it.................................................................32

B.  Porter fails to satisfy even the *McVey* test because he was not speaking as a citizen on matters of public concern ...........................35

i.  The Survey Methodology Comment.........................................38

ii.  The Hiring Process Email ........................................................39

iii.  The Conference Agenda Blog Post...........................................40

C.  The balance of interests favors NC State ............................................43

D.  Porter otherwise fails to state individual capacity claims against the BOT and Woodson........................................................45

III.  Porter's claims against the individual Defendants in their individual capacities are barred by qualified immunity ..............................................  46

IV.  Porter's claims for monetary damages against all Defendants in their official capacities are barred by sovereign immunity and the Eleventh Amendment..................................................................  50

V.  Porter's request for an injunction permitting him to join the Higher Education Access, Equity, and Justice Program Area of Study is not prospective relief under *Ex parte Young* .....................................................  51

CONCLUSION ...........................................................................................53

STATEMENT REGARDING ORAL ARGUMENT ...........................................54

- ii -

CERTIFICATE OF COMPLIANCE.........................................................................56

CERTIFICATE OF FILING AND SERVICE .......................................................57

## TABLE OF CASES AND AUTHORITIES

**Cases**

*Adams v. Anne Arundel Cnty. Pub. Sch.*,
   789 F.3d 422 (4th Cir. 2015)...............................................................25

*Adams v. Trustees of the Univ. of N.C.-Wilmington*,
   640 F.3d 550 (4th Cir. 2011)........................................................ passim

*Am. Civil Liberties Union of Maryland, Inc. v. Wicomico Cnty., Md.*,
   999 F.2d 780 (4th Cir. 1993).......................................................... 17, 19

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011) ............................................................................47

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................16

*Boone v. Goldin*,
   178 F.3d 253 (4th Cir. 1999)..................................................... 19, 23, 24

*Booth v. Maryland*,
   337 Fed. Appx. 301 (4th Cir. 2009)....................................................29

*Boring v. Buncombe Cnty. Bd. of Educ.*,
   136 F.3d 364 (4th Cir. 1998)..............................................................34

*Brooks v. Arthur*,
   685 F.3d 367 (4th Cir. 2012)........................................... 15, 36, 37, 40

*Brooks v. Univ. of Wisconsin Bd. of Regents*,
   406 F.3d 476 (7th Cir. 2005)..............................................................38

*Burlington N. & Santa Fe Ry. Co. v. White*,
   548 U.S. 53 (2006) ....................................................... 19, 20, 25, 26

*Canady v. Crestar Mortg. Corp.*,
   109 F.3d 969 (4th Cir. 1997)................................................................21

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*,
   334 F.3d 390 (4th Cir. 2003)..............................................................16

*Carlson v. Univ. of New England*,
   899 F.3d 36 (1st Cir. 2018).................................................................26

*Causey v. Balog*,
   162 F.3d 795 (4th Cir. 1998)..............................................................29

*Clark Cnty. Sch. Dist. v. Breeden*,
   532 U.S. 268 (2001).............................................................................29

*Clinger v. New Mexico Highlands Univ., Bd. of Regents*,
   215 F.3d 1162 (10th Cir. 2000)..........................................................42

*Colburn v. Trustees of Indiana Univ.*,
   973 F.2d 581 (7th Cir. 1992)..............................................................42

*Connick v. Myers*,
   461 U.S. 138 (1983).............................................................. 18, 36, 37

*Constantine v. Rectors & Visitors of George Mason Univ.*,
   411 F.3d 474 (4th Cir. 2005)................................................ 19, 23, 46

*Cravey v. Univ. of N. Carolina at Chapel Hill*,
   No. 1:17-CV-1014, 2018 WL 4471732 (M.D.N.C. Sept. 18, 2018)...................27

*Crouse v. Town of Moncks Corner*,
   848 F.3d 576 (4th Cir. 2017)................................................... 33, 48

*Csicsmann v. Sallada*,
   211 Fed. Appx. 163 (4th Cir. 2006)..................................................26

*DiMeglio v. Haines*,
   45 F.3d 790 (4th Cir.1995).................................................................48

*Dorsett v. Bd. of Trustees for State Colleges & Universities*,
  940 F.2d 121 (5th Cir. 1991)...............................................................42

*Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd.,*
  *Pshp.*, 213 F.3d 175 (4th Cir. 2000)...................................................17

*Edwards v. City of Goldsboro*,
  178 F.3d 231 (4th Cir. 1999)...............................................................43

*Ellis v. Louisiana-Pac. Corp*.,
  699 F.3d 778 (4th Cir. 2012)...............................................................17

*Engler v. Harris Corp*.,
  No. GLR-11-3597, 2012 WL 3745710 (D. Md. Aug. 28, 2012)..........................27

*Evans v. B. F. Perkins Co.*,
  166 F.3d 642 (4th Cir. 1999)...............................................................16

*Ex parte Young*,
  209 U.S. 123 (1908) ............................................................... 12, 51, 52

*Feminist Majority Found. v. Hurley*,
  911 F.3d 674 (4th Cir. 2018)...............................................................20

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ...................................................................... *passim*

*Goldstein v. Chestnut Ridge Volunteer Fire Co*.,
  218 F.3d 337 (4th Cir. 2000)....................................................... *passim*

*Green v. Mansour*,
  474 U.S. 64 (1985) .............................................................................51

*Holland v. Washington Homes, Inc*.,
  487 F.3d 208 (4th Cir. 2007)...............................................................26

*James v. Booz-Allen & Hamilton, Inc*.,
  368 F.3d 371 (4th Cir. 2004)....................................................... 24, 25

*Jemsek v. N.C. Med. Bd.*,
  No. 5:16-CV-59-D, 2017 WL 696721 (E.D.N.C. Feb. 20, 2017), *affirmed by* 697
  F. App'x 234 (4th Cir. 2017) ...............................................................................51

*Joyner v. Lancaster*,
  815 F.2d 20 (4th Cir. 1987)...............................................................................45

*Jurgensen v. Fairfax Cnty., Va.*,
  745 F.2d 868 (4th Cir. 1984)........................................................................ 36, 37

*Jyachosky v. Winter*,
  343 Fed. Appx. 871 ..............................................................................................26

*Kelly v. Omaha Hous. Auth.*,
  721 F.3d 560 (8th Cir. 2013)...............................................................................20

*Kirby v. City Of Elizabeth City, N. Carolina*,
  388 F.3d 440 (4th Cir. 2004)...............................................................................48

*League of Women Voters of N. Carolina v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014)...............................................................................53

*Lee v. York Cnty. Sch. Div.*,
  484 F.3d 687 (4th Cir. 2007)...............................................................................33

*Maciariello v. Sumner*,
  973 F.2d 295 (4th Cir.1992)................................................................................48

*Mahanoy Area Sch. Dist. v. B. L.*,
  141 S. Ct. 2038 (2021) .................................................................................. 49, 50

*McVey v. Stacy*,
  157 F.3d 271 (4th Cir. 1998)........................................................................ passim

*MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*,
  303 F.3d 523 (4th Cir. 2002)...............................................................................17

*Pascual v. Lowe's Home Centers, Inc.*,
  193 Fed. Appx. 229 (4th Cir. 2006).....................................................................29

*Patane v. Clark*,
   508 F.3d 106 (2d Cir. 2007).....................................................................27

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ..............................................................................47

*Penley v. McDowell Cnty. Bd. of Educ.*,
   876 F.3d 646 (4th Cir. 2017).............................................. 14, 28, 29, 46

*Phillips v. LCI Int'l Inc.*,
   190 F.3d 609 (4th Cir. 1999)...................................................................6

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*,
   391 U.S. 563 (1968) ........................................................................ 18, 43

*Pike v. Osborne*,
   301 F.3d 182 (4th Cir. 2002)..................................................................48

*Rankin v. McPherson*,
   483 U.S. 378 (1987) ........................................................................ 43, 44

*Renken v. Gregory*,
   541 F.3d 769 (7th Cir. 2008)..................................................................34

*Republic of Paraguay v. Allen*,
   134 F.3d 622 (4th Cir.1998)...................................................................51

*Ridpath v. Bd. of Governors Marshall Univ.*,
   447 F.3d 292 (4th Cir. 2006).............................................. 28, 47, 48

*Rowland v. Perry*,
   41 F.3d 167 (4th Cir. 1994)....................................................................48

*Smith v. Gilchrist*,
   749 F.3d 302 (4th Cir. 2014)..................................................................43

*Stroman v. Colleton Cnty. Sch. Dist.*,
   981 F.2d 152 (4th Cir. 1992)....................................... 36, 41, 42, 50

*Urofsky v. Gilmore*,
    216 F.3d 401 (4th Cir. 2000)....................................................................34

*Zachair, Ltd. v. Driggs*,
    965 F. Supp. 741 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998) ..............35

**Statutes**

42 U.S.C. § 1983 .....................................................................................2, 17

**Rules & Regulations**

Fed. R. App. P. 32........................................................................................56

Fed. R. App. P. 34........................................................................................54

Fed. R. Civ. P. 12(b) .......................................................................... 12, 16, 17

**Additional Authorities**

BLACK'S LAW DICTIONARY (11th ed. 2019) ............................................52

## STATEMENT OF THE ISSUES

1.    Did the district court properly grant Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim where Plaintiff has not plausibly alleged a materially adverse employment action caused by the communications at issue?

2.    In the alternative, did the district court properly grant Defendants' motion to dismiss where Plaintiff's claim arises not from communications addressing a matter of public concern but instead from non-protected communications focusing on personal grievances and internal faculty disputes?

3.    In the alternative, did the district court properly grant Defendants' motion to dismiss on the basis of qualified immunity where there is no support for Plaintiff's argument that the personal grievances and internal faculty disputes alleged by Plaintiff are subject to constitutional protection and, therefore, Plaintiff's purported right to engage in such exchanges was not clearly established?

## STATEMENT OF THE CASE

Plaintiff-Appellant Stephen Porter, a professor in the College of Education at North Carolina State University ("NC State"), commenced this action on September 14, 2021, against Defendants-Appellees, Board of Trustees of NC State ("BOT"), W. Randolph Woodson (Chancellor of NC State), Mary Ann Danowitz (former Dean of the College of Education), John K. Lee (current Head of the Department of

Educational Leadership, Policy, and Human Development (the "Department")), Penny A. Pasque (former Head of the Department), and Joy Gaston Gayles (Professor in the Department and Program Coordinator). (J.A. 006-032). Porter asserts a retaliation claim under 42 U.S.C. § 1983 for violation of the First and Fourteenth Amendments to the United States Constitution.

## I.    Background on the parties and the structure of the College of Education.

Porter has been a tenured professor in NC State's College of Education since 2011. (J.A. 008). Porter was hired to teach courses in graduate-level statistics and research methods in the College of Education, of which the Department is a part. When Porter was hired, he joined the Higher Education Program Area within the Department, but he does not allege that he actually teaches, or has ever taught, classes in Higher Education. (J.A. 010-011).

The Department offers two degrees in Higher Education: a Master's degree and a Ph.D. degree. The Department does not offer undergraduate degrees. In 2015, the College of Education created a college-wide Ph.D. program called the Scholar Leader Ph.D. As a result of this reorganization, the College of Education had two separate tracks—the Master's degree programs, located within the Higher Education Program Area; and the Ph.D. programs, located in a separate Ph.D. "Program Area of Study." (J.A. 010). Porter alleges that the Department continued to address both Master's and Ph.D. matters within the original Program Areas, but he admits that,

after the 2015 reorganization, the Higher Education Program Area was intended to focus on Master's students, and the Ph.D. Program Area of Study was intended to focus on doctoral students. (J.A. 010-011).

Porter alleges that, prior to the matters alleged in the Complaint, he spent "considerable time" on Higher Education Ph.D. activities, including advising Higher Education Ph.D. students, serving on Higher Education Ph.D. committees, and actively recruiting prospective Ph.D. students. (J.A. 011). Porter admits, however, that he has had "limited involvement" with the Master's degree program, has no Master's degree advisees, and does not attend events that are related only to the Master's degree. (J.A. 010). Instead, Porter's almost exclusive focus was on the Ph.D. program, which, after 2015, was part of the Ph.D. Program Area of Study, not the Higher Education Program Area. (J.A. 010-011).

## II.    The communications giving rise to Plaintiff's Complaint.

Porter alleges that he has been "outspoken" in recent years about his concern regarding "how the focus on so-called 'social-justice' is affecting academia in general" and "his concern that the field of higher education study is abandoning rigorous methodological analysis in favor of results-driven work aimed at furthering a highly dogmatic view of 'diversity,' 'equity,' and 'inclusion.'" (J.A. 011). Based on the allegations of the Complaint, Porter's outspokenness appears to have been largely confined to meetings and communications internal to the Department. (J.A.

012, J.A. 014, J.A. 019-020). Porter's claims arise from three communications he made between 2016 and 2018.

## A.    Communication #1 (the "Survey Methodology Comment")

In Spring 2016, during an internal department meeting, Porter expressed concerns about the survey methodology employed in drafting a new question for student course evaluations that had been proposed by a junior professor. (J.A. 012). Porter claims that the discussion was "amicable," but acknowledges that it was "perhaps embarrassing for [the other professor], as it became apparent that the [College of Education's] Council had created the new question about diversity without consideration or testing for validity and reliability." (J.A. 012).

Porter further acknowledges that the discussion he calls "amicable" was described as hostile by his colleagues. In May 2017, a "Climate Check Report" was conducted by NC State's Office for Institutional Equity and Diversity in which Porter was described by other faculty as a "bully." (J.A. 012). Porter admits that his conduct during the Spring 2016 departmental meeting was referenced as an example of his bullying. (J.A. 012). Defendant Pasque, who became head of the Department at the beginning of the 2017-18 academic year, discussed the report with Porter during a meeting in November 2017. (J.A. 013). In January 2018, Pasque emailed Porter restating the concern regarding "bullying," and she invited him to respond. The January 2018 email was placed in Porter's personnel file. (J.A. 014).

### B.      Communication #2 (the "Hiring Process Email")

In April 2018, the journal *Inside Higher Ed* published an article about a faculty search committee at NC State chaired by one of Porter's colleagues, Alyssa Rockenbach. The search committee had included as a finalist for a faculty position a professor from another university who had been terminated by that university based on allegations of wrongdoing. (J.A. 014). Porter alleges he was concerned that his NC State colleague had "cut corners" in vetting the candidate "out of a desire to hire a Black scholar whose work focused on racial issues." After the article was published, Porter sent an email on April 11, 2018, to the Higher Education faculty linking to the article and stating, in its entirety: "Did you all see this? . . . This kind of publicity will make sure we rocket to number 1 in the rankings. Keep up the good work, Alyssa!" (J.A. 015).

In her capacity as head of the Department, Pasque met with Porter a week later, asking him about his intent in sending the email. Porter admits that faculty had commented to Pasque about the email or forwarded it to other faculty. (J.A. 015-016). Porter asserts, for example, that Defendant Gayles, a professor and the Program Coordinator of the Higher Education Program Area, wrote to Pasque: "NOT COOL!!!! I am so mad about all of this I could scream!! I can't stay silent about this. It's maddening!" Porter also learned that Rockenbach had forwarded Porter's email to Pasque, Danowitz, and others. (J.A. 015).

Porter alleges that during a follow up meeting with Pasque on April 24, 2018, Pasque inquired as to whether Porter had to remain a member of the Higher Education Program Area or whether he could be a member of the department without a program area. (J.A. 016). Porter received a positive annual evaluation that year, with a notation that he, and all faculty, were expected to be collegial. (J.A. 017).

### C.     Communication #3 (the "Conference Agenda Blog Post")

On September 3, 2018, Porter published on his personal blog a post entitled, "ASHE[1] Has Become a Woke Joke." (J.A. 017). According to the Complaint, the post "commented on some research a colleague of his had gathered about topics under discussion at the upcoming ASHE conference, which demonstrated that the focus of the conference had shifted from general post-secondary research to a focus on social justice." (J.A. 017). The text of the post, however, says nothing about "social justice." It reads as follows:

> A colleague sent this to me. They searched the latest Association for the Study of Higher Education (ASHE) conference program for the following [25] terms, to see how many sessions came up . . . . I prefer conferences where 1) the attendees and presenters are smarter than me and 2) I constantly learn new things. That's why I stopped attending ASHE several years ago and switched to AEFP.[2]

---

[1] ASHE stands for the "Association for the Study of Higher Education." ASHE is a national group, not an NC State entity. (J.A. 018).

[2] The district court properly considered the full text of the blog post, which "was integral to and explicitly relied on in the complaint." *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

(J.A. 037-038). Porter maintains that his criticism of ASHE generated controversy within the higher education community, citing two tweets. (J.A. 017-018).

## III. Faculty leaders attempt to address concerns about Porter's treatment of his colleagues.

At or around this time, Danowitz informed the Higher Education Program Area faculty that there was an opportunity for a potential spousal hire. She asked faculty to meet and decide whether to interview the spouse. Instead of discussing the candidate at a Higher Education Program Area faculty meeting as planned, Pasque invited Porter to a meeting on October 15, 2018, to which Gayles and two other people were also invited. (J.A. 018). Pasque proposed that Porter join her in a new Higher Education Policy Program Area with the potential spousal hire. (J.A. 019). Porter acknowledges in the Complaint that he was frustrated and admits that he responded to the idea as follows: "**Give me a fucking break, folks**. I was the one who said [the potential spousal hire] should come. And now, I'm the bad guy because I don't want to leave Higher Ed for a non-existent program area." (J.A. 019-020) (emphasis added).

On October 18, 2018, Porter received a letter from Pasque "chastising him" for his use of profanity during the faculty meeting. (J.A. 020).

On November 7, 2018, Pasque sent another letter to Porter expressing concerns regarding his behavior. In this letter, Pasque referenced the results of the

2017 Climate Check Report (which labelled Porter as a bully), the Hiring Process Email, in which he chastised a colleague, and his profanity during the October 15, 2018, meeting. Porter was informed that if he failed to repair his relationships with faculty in the Higher Education Program Area or displayed a "lack of collegiality" again, he would be removed from the Higher Education Program Area. (J.A. 020).

Subsequently, Porter learned that the president of ASHE, Dr. Lori Patton Davis, had criticized his September 2018 blog post in her keynote address at the ASHE conference.[3] (J.A. 021). During the ASHE conference, which occurred in November 2018 (two months after Porter's blog post), the keynote speaker showed a slide of the post and a photograph of Porter during her address. Following the conference, on November 19, 2018, Pasque notified Porter via email that the Department graduate students were having a "strong reaction" to the keynote address. (J.A. 021). Pasque recommended a community meeting where Porter could address the graduate students' concerns. Pasque told Porter that a community conversation would help students reconcile the "great teacher" they knew at NC State with what they heard from the president of ASHE. Porter admits that he did not agree to have a school community meeting to address any student concerns and instead questioned whether such a meeting was necessary. (J.A. 021-022). Porter

---

[3] Porter does not assert that Davis is a current or former employee of NC State.

acknowledges that at least two doctoral students had spoken to Pasque about the ASHE matter. (J.A. 021).

On February 19, 2019, Pasque met again with Porter. During this meeting, Pasque expressed her frustration with Porter's failure to address proactively student and faculty concerns about "what happened at ASHE." (J.A. 022).

## IV.    Porter is reassigned from the Higher Education Program Area, which focuses on Master's students, but remains in the Ph.D. Program Area of Study.

On July 5, 2019, more than 10 months after the September 3, 2018, Conference Agenda Blog Post, more than a year after the Hiring Process Email, and more than three years after the Survey Methodology Comment, Porter received his annual review from Pasque. (J.A. 022-023). The review noted his accomplishments for the year, but informed him that he was being reassigned from the Higher Education Program Area—i.e., the Program Area that focused on Master's students, with whom Porter had previously had "limited involvement"—because "the Higher Education faculty were not able to make concerted progress" on resolving issues within the Program Area. (J.A. 023). Porter does *not* allege that he was removed from the Ph.D. Program Area of Study. The review also informed Porter that he would be expected to teach an additional course due to his reduced departmental workload. (J.A. 023).

In July 2019, Pasque left NC State and was replaced as Head of the Department by Defendant Lee. Lee informed Porter that he would not be required to teach an extra course following his filing of an internal grievance on August 28, 2019. (J.A. 023).

Porter asserts that his removal from the Higher Education Program Area resulted in his exclusion from certain activities in 2019 pertaining to Ph.D. students, including the Higher Education Orientation, the Higher Education welcome cookout, and the Higher Education Retreat. Porter contends that Lee and Gayles also "excluded" him from the 2019 Diagnostic Advisement Procedure process for second-year Ph.D. students which, according to Porter, undermined his role as an advisor to his students. (J.A. 023-024). Porter later expressed concern to Lee that he was being "set up" so that when he was up for post-tenure review in a few years, he would not have any advisees and could be stripped of tenure and fired for not fulfilling his job duties. (J.A. 026).

Porter's concerns formed the basis for an internal grievance filed in 2019. (J.A. 023). Porter states that his internal grievance "was denied" in June 2020, "finding that it was within Defendant Pasque's discretion to remove Porter from the Higher Education Program Area." The faculty grievance panel also found that "although he had been excluded from numerous doctoral activities, that had not been Defendant Lee's intent." (J.A. 027). Porter acknowledges that the Higher Education

Program Area meetings, from which he was allegedly excluded, were focused on the Master's degree program only. (J.A. 026-027). Porter concedes he has no Master's advisees and does not attend events related only to the Master's degree. (J.A. 010).

In October 2020, the Department faculty, led by Gayles and Rockenbach, proposed a new Ph.D. Program Area of Study referred to as "Higher Education Access, Equity, and Justice." (J.A. 027). Porter was not asked to join this new Ph.D. Program Area of Study and speculates that the creation of the new Ph.D. Program Area of Study will impact his ability to perform his duties, such as obtaining and advising Ph.D. students. Porter does not allege that he ever asked to join the new Ph.D. Program Area of Study, nor does he allege that he would have joined it had he been invited. (J.A. 028-029). Porter acknowledges that another faculty member chose not to join the new Ph.D. Program Area of Study. (JA 028). Porter does not assert that this other faculty member suffered any adverse consequences by not joining the new group.

While Porter alleges that his removal from the Higher Education Program Area could impact his future at NC State, he:

- does not allege he has lost any advisees;

- does not allege he is unable to recruit and obtain new advisees;

- does not allege his future as a Professor has been questioned or is in actual jeopardy;

- does not allege he has been disciplined, demoted, subjected to any decrease in salary or benefits, or suffered any other non-speculative, tangible negative impact in his position.

To the contrary, Porter remains employed as a tenured Professor with NC State in the Department. (J.A. 010). It is also significant that Porter does not state that he was ever asked to retract his statements, cease posting on his personal blog, or stop expressing his opinions. Porter was simply asked to remain collegial with other faculty and to have an open dialogue with graduate students to address concerns related to the ASHE conference. (J.A. 016-017, J.A. 021).

## V.    The district court dismisses Porter's claims.

On November 23, 2021, Defendants filed a Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). (J.A. 033-038). On June 17, 2022, the district court granted the Motion under Rules 12(b)(1) and 12(b)(6). (J.A. 039-054). In granting the Motion, the district court concluded:

- Porter's claims for damages against the official capacity Defendants and the BOT are barred by sovereign and Eleventh Amendment immunity. (J.A. 046). The court further held that only Porter's claim for reinstatement to the Higher Education Program Area is allowed under *Ex parte Young*, 209 U.S. 123 (1908). (J.A. 047-048).

- Porter had failed to allege any materially adverse employment action because all of his alleged harms are speculative or are otherwise contradicted by the factual allegations of the Complaint. (J.A. 049-050).

- Porter had failed to allege a causal connection between the speech at issue and the alleged adverse employment action. (J.A. 050-051).

- 12 -

- Even assuming Porter had adequately alleged a First Amendment retaliation claim, the individual Defendants would be entitled to qualified immunity. (J.A. 051).

The district court "declined to address whether plaintiff was speaking as a citizen upon a matter of public concern and whether plaintiff's interest in speaking outweighed [] NCSU's interest." (J.A. 051).

On June 30, 2022, Porter filed his Notice of Appeal. (J.A. 055-056).

## SUMMARY OF THE ARGUMENT

In his opening brief, Porter portrays himself as a lonely crusader against what he calls academia's "focus on so-called 'social justice'" and its "highly dogmatic view of 'diversity,' 'equity,' and 'inclusion.'" (Porter Br. at 2) (quotation marks in original). But there is a fundamental problem with Porter's argument: while Porter may view himself as a warrior against "wokeness," the communications described in the Complaint do not take up that fight.

That fact is ultimately what distinguishes this case from the cases Porter principally relies on, including *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011). Unlike in *Adams*, Porter's speech focused entirely on the minutiae of personal grievances and internal faculty disputes, not issues of social justice or diversity. In fact, in the communications upon which he bases his claims, Porter seemed far more interested in belittling his colleagues than engaging them in a debate about a genuine issue of public concern.

- 13 -

This Court's focus in assessing Porter's claims must be on what Porter *actually* said in the communications at issue, not on what Porter—years later—contends he was thinking or meant when he said them. Porter's claim is that Defendants retaliated against him for his words, and, on that basis, his claim fails as a matter of law.

*First*, the district court correctly held that Porter has failed to allege any materially adverse employment action that is not speculative or contradicted by the factual allegations in his Complaint. Porter has not lost his job, been demoted, lost a promotion, or suffered a cut in pay. At most, Porter was removed from a Program Area that focuses entirely on Master's students, with whom Porter admittedly has no involvement.

*Second*, the district court also correctly held that Porter cannot establish that the communications at issue were the "but for" cause of his alleged materially adverse employment actions. The 10-month gap between the last comment at issue and the first alleged employment action is too long to support causation. *See Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 654-55 (4th Cir. 2017).

*Third*, the communications that form the basis of Porter's claims are not actionable because they were not made by a private person speaking on an issue of public concern. Instead, those communications are just the sort of "personal grievances" this Court has repeatedly refused to protect in the workplace. *See, e.g.,*

*Brooks v. Arthur*, 685 F.3d 367, 372 (4th Cir. 2012).

*Fourth*, whatever public import Porter's communications might be interpreted to have, it is far outweighed by NC State's interest "as an employer, in promoting the efficiency of the public services it performs through its employees." *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). Porter seeks constitutional protection for his harsh, disruptive attacks on his colleagues and for his unwillingness to comply with his supervisor's requests to address the negative impact of those attacks. Porter's attacks, by his own admission, upset faculty and graduate students alike and impacted the operation of the department. This Court has long held that the First Amendment is not a blank check to insult your colleagues and ignore the requests of your supervisors. *See Brooks*, 685 F.3d at 373 ("Were we to constitutionalize poor personal chemistry in the workplace, however, we would . . . elevate the infinitude of worker dissatisfactions with supervisors to a constitutional plane.")

In short, Porter's First Amendment retaliation claim fails at every step of the analysis. Even if it didn't, however, the individual-capacity Defendants are entitled to qualified immunity, and the official-capacity Defendants are entitled to sovereign and Eleventh Amendment immunity. Porter cannot point to any case establishing beyond dispute that the internal employee grievances at issue in this case—delivered in the form of insults and personal attacks—are subject to constitutional protection.

Finally, in addition to the arguments above, Porter's claims against Chancellor

Woodson and the BOT are frivolous. The claims are unsupported by a single factual allegation of wrongdoing. Indeed, Chancellor Woodson and the BOT are not mentioned a single time in Porter's opening brief.

\* \* \*

The district court properly focused on the actual statements at issue and the context in which they were delivered. This Court should affirm the district court's dismissal of Porter's claims.

## STANDARD OF REVIEW

When subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction to survive dismissal. *Evans v. B. F. Perkins Co.*, 166 F.3d 642, 647-50 (4th Cir. 1999). The same is true for jurisdictional challenges pursuant to Rule 12(b)(2). *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citations omitted).

To survive a Rule 12(b)(6) motion, a complaint must rise above the "speculative level" and satisfy the court that the claims asserted are plausible on their face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). The complaint must "permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. A

court need not accept as true "unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp.*, 213 F.3d 175, 180 (4th Cir. 2000).

This Court's review of an order granting a motion to dismiss under Rules 12(b)(1) and 12(b)(6) is *de novo*. *See Ellis v. Louisiana-Pac. Corp*., 699 F.3d 778, 782 (4th Cir. 2012). On *de novo* review, the court is "entitled to affirm the court's judgment on alternate grounds, if such grounds are apparent from the record." *Id.* at 786-87 (citing *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 536 (4th Cir. 2002)).

## **ARGUMENT**

### I.    **The district court correctly held that Porter fails to allege either a materially adverse employment action or the required causal connection.**

In deciding a motion to dismiss a claim under 42 U.S.C. § 1983 for First Amendment retaliation, the court must analyze four elements, each of which the plaintiff is required to satisfy. First, as a threshold matter, the plaintiff must plausibly allege "that she suffered some adversity in response to her exercise of protected rights." *Am. Civil Liberties Union of Maryland, Inc. v. Wicomico Cnty., Md*., 999 F.2d 780, 785 (4th Cir. 1993). Accordingly, "[w]here there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim." *Id.* This is a question of law. *Goldstein v. Chestnut Ridge Volunteer Fire Co*., 218 F.3d

337, 352 (4th Cir. 2000).

If the court concludes that this threshold pleading requirement has been met, it then must determine:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's [adverse employment] decision.

*McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998). *See also Connick v. Myers*, 461 U.S. 138, 147-150 (1983); *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968).

The first two elements of this test are questions of law. The causation question on which the third element turns may also be resolved at this stage if "there are no causal facts in dispute." *Goldstein*, 218 F.3d at 352.

The district court correctly concluded that Porter had failed to allege an adverse employment action and causation. The district court declined to address the remaining elements of the test. However, because Porter's allegations fail at each step of this analysis, those elements provide additional reasons to affirm.

## A.    Porter has not plausibly alleged any non-speculative, materially adverse employment action.

The district court held that Porter's alleged adverse employment actions are

so speculative as to be non-actionable or are otherwise contradicted by the factual allegations of the Complaint. (J.A. 049-050). This holding should be affirmed.

This Court has defined an adverse employment action as one that "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ*., 411 F.3d 474, 500 (4th Cir. 2005) (citations omitted). *See also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.") (cleaned up).

However, "[n]ot all retaliatory conduct tends to chill First Amendment activity . . . , and a plaintiff seeking to recover for retaliation must show that the defendant's conduct resulted in something more than a '*de minimis* inconvenience' to her exercise of First Amendment rights." *Constantine*, 411 F.3d at 500 (citing *ACLU of Md. Inc.,* 999 F.2d at 786 n.6).

Typically, to satisfy this objective test, a plaintiff must allege "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th

Cir. 1999).[4] By contrast, "those petty slights or minor annoyances that often take place at work and that all employees experience" do not constitute "*material* adversity." *White*, 548 U.S. at 68 (emphasis in original). Courts undertaking this analysis must, therefore, "separate significant from trivial harms." *Id. See also Kelly v. Omaha Hous. Auth.*, 721 F.3d 560, 562 (8th Cir. 2013) (applying *White* test to First Amendment retaliation claim), *cert. denied* 571 U.S. 1167 (2014).

In this case, Porter argues that he suffered a so-called "death by a thousand cuts," which, when taken in the aggregate, constitute a materially adverse action insofar as they caused a "diminution in responsibility." (Porter Br. at 20-21). According to Porter, the various "cuts" alleged are:

- He was reassigned from the Higher Education Program Area in July 2019 (J.A. 023);

- Because of his removal from the Higher Education Program Area, he was prevented from taking part in the 2019 Diagnostic Advisement Procedure for second-year Ph.D. students (J.A. 024);

- Defendants excluded him from an annual Ph.D. admissions meeting in 2019 where advisees were assigned (J.A. 027);

- Porter was barred from attending the Higher Education Orientation, the Higher Education welcome cookout, and the Higher Education Retreat in 2019 (J.A. 024);

---

[4] "The standard for proving a materially adverse action in the Title VII retaliation context . . . is similar to the standard for demonstrating an adverse action in the First Amendment retaliation context." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 697 n.12 (4th Cir. 2018).

- Porter was not asked to join a new Ph.D. Program Area of Study referred to as "Higher Education Access, Equity, and Justice" (J.A. 028).

As detailed above, Porter does *not* allege that he has lost any advisees; that he has been unable to recruit and obtain new advisees; that his future as a professor has been questioned or is in actual jeopardy; or that he has been disciplined, demoted, or subjected to any decrease in salary or benefits. (J.A. 049-050).

The district court correctly held, in relevant part, that all of Porter's alleged harms flow from two non-actionable employment actions: (1) Porter's removal from the Higher Education Program Area, after which he was allegedly excluded from various events in 2019; and (2) Porter not receiving an invitation to join the newly formed Higher Education Access, Equity, and Justice Program Area of Study. (J.A. 049).[5]

As to the first alleged adverse action, the district court appropriately noted that any adverse consequence arising from Porter's removal from the Higher Education Program Area was "speculative." (J.A. 050). Porter's own allegations contradict any claim of a material adverse consequence he suffered as a result of being reassigned away from that Program Area. The Complaint makes clear that after the

---

[5] In the district court, Porter also alleged that he was required to teach a fifth class, even though that requirement was withdrawn before he ever had to teach a fifth class. (J.A. 049). On appeal, Porter has abandoned that claim. *Canady v. Crestar Mortg. Corp.*, 109 F.3d 969, 973 (4th Cir. 1997) (A party waives an issue that it "failed to argue, or even mention" in its appellate brief).

- 21 -

department's 2015 reorganization, the Higher Education Program Area was focused entirely on the Master's program. (J.A. 010). Porter admits that by his own choice he had "limited involvement with the Master's program during his time at NCSU" and that he has "no Master's advisees and does not attend events related only to the Master's degree." (J.A. 010).

Accordingly, Porter cannot have suffered a materially adverse consequence from being reassigned away from a Program Area that focuses exclusively on students with whom Porter has not worked and with whom he does not plan to work.

Porter's second alleged adverse action—that he was not invited to join the newly formed Higher Education Access, Equity, and Justice Program Area of Study—cannot support a retaliation claim. Porter does not allege that he ever asked to join the new Ph.D. Program Area of Study, nor does he allege that he would have joined it had he been invited. (J.A. 028-029).

In an attempt to salvage an actionable harm from this allegation, Porter layers speculation on top of speculation. He alleges that had one of his colleagues "not declined the invitation to join the new PAS, Plaintiff would have been the only full-time the Department faculty member remaining in the old Higher Education PAS." (J.A. 029). But Porter admits that his colleague *did* decline the invitation, rendering Porter's allegation purely hypothetical. The creation by two faculty colleagues of the new Higher Education Access, Equity, and Justice Program Area of Study—whether

Porter joined it or not—cannot constitute an adverse employment action as to Porter.

In his brief, Porter also cites his alleged inability to take part in the September 2019 Diagnostic Advisement Procedure and other vaguely defined meetings relating to it. (J.A. 024-025). This argument fares no better. Porter does not allege that his supposed exclusion extended past 2019, nor does he assert that, in the three years since it occurred, any harm resulted from his non-participation in the 2019 meetings. Porter does not claim that he lost advisees as a result or that any advisees questioned or even mentioned this to him. Porter also admits that Lee informed him that it was not the intention of NC State to exclude him from meetings impacting Ph.D. students. (JA 027).

It is worth noting that the alleged adverse actions did not deter Porter from further exercise of his First Amendment right. For example, he filed a grievance, which was denied by a faculty panel in June 2020. (J.A. 027). *See Constantine*, 411 F.3d at 500 ("While the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity, it is not dispositive.").

Faced with similar facts, this Court has repeatedly held that there was no adverse employment action. In *Boone*, the plaintiff alleged that a reassignment to a less favorable position that caused her "increased stress" constituted a materially adverse employment action. 178 F.3d at 255-56. The court disagreed.

- 23 -

> [A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position.

*Id.* at 256–57.

Later, in *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371 (4th Cir. 2004), this Court rejected a claim with allegations very similar to Porter's. There, the plaintiff had alleged "a litany of adverse changes to the terms and conditions of his employment," including "his removal as Project Manager" for a particular project, which resulted in a "denial of opportunities for promotion and professional development." *Id.* at 376. More specifically:

> James asserts that his potential for promotion and professional development was stymied by his reassignment in February 1999 and his subsequent treatment. He claims he was not considered for managing other projects and that because of that he was able to bill less. As a result of this lower billing, he claims that he would have been ineligible for future bonuses and that harassment about his low billing suggested that his job was in jeopardy. He asserts further that he was excluded from important meetings dealing with the WMATA project and excluded from a conference that a similarly situated white male was permitted to attend. James claims he was also denied the opportunity to regain his Project Manager position when his successor was reassigned after a few months.

*Id*.

This Court in *James* dispensed with the plaintiff's laundry list of grievances,

and its reasoning applies with equal force here. It was "significant" to the court that "James retained his position . . . and received the same pay, benefits, and other terms and conditions of employment." *Id.* at 376-77. The plaintiff's claim that he had been "excluded from 'important meetings' lack[ed] specificity" and failed to explain "how the alleged exclusions, whatever they might have been, adversely affected him." *Id*. at 377.

> In sum, an employee's dissatisfaction with this or that aspect of work does not mean an employer has committed an actionable adverse action. And speculation about the future adverse consequences of a reassignment may not rise to the level of a genuine dispute.

*Id. See also id.* at 376 ("The mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action. A reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect.") (citations and quotation omitted); *Adams v. Anne Arundel Cnty. Pub. Sch*., 789 F.3d 422, 431 (4th Cir. 2015) ("It is surely true that Farrare and the Board did things that Adams personally did not like. But dislike of or disagreement with an employer's decisions does not invariably make those decisions ones that adversely affected some aspect of employment.").

Porter argues that the Supreme Court's decision in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, created a "decidedly more relaxed" standard for what

constitutes an adverse employment action in retaliation cases. (Porter Br. at 22). *White*, however, was consistent with this Court's prior decisions, including *Boone* and *James*. Indeed, this Court has frequently cited and relied on *Boone* and *James* since *White*. *See, e.g.*, *Jyachosky v. Winter*, 343 Fed. Appx. 871, 877 and n.* (4th Cir. 2009); *Holland v. Washington Homes, Inc*., 487 F.3d 208, 219 (4th Cir. 2007) (finding no "adverse employment action" where the alleged harm arising from realtor's reassignment to "blighted" neighborhood was speculative). *But see Csicsmann v. Sallada*, 211 Fed. Appx. 163, 168 (4th Cir. 2006) ("*White* explains that while factors other than the terms and conditions of employment may be examined in determining whether an adverse employment action occurred, this is still a heavy burden for the plaintiff: the alleged adverse action must be material.").

The cases cited by Porter (all of which are district court cases or cases from outside the Fourth Circuit), do not compel a different conclusion. In *Carlson v. Univ. of New England*, 899 F.3d 36 (1st Cir. 2018), the plaintiff alleged that her retaliatory "transfer to a new department led to a change in her teaching assignments, her removal from the ESP Department website, and her removal as an advisor to ESP Department students." *Id.* at 44. Porter cannot allege, and has not alleged, a transfer to a new department and change in teaching assignments, removal as an advisor to any student, or removal from the department website.[6]

---

[6] *See* https://ced.ncsu.edu/graduate/programs/doctoral/higher-education/.

Similarly, in *Patane v. Clark*, 508 F.3d 106 (2d Cir. 2007), the plaintiff alleged that her supervisor had "removed 'virtually all of her secretarial functions' in response to her reporting his conduct." *Id.* at 116. Porter's allegations fall far short of this mark, relying instead on speculation about a possible *future* diminution in responsibility.

In *Cravey v. Univ. of N. Carolina at Chapel Hill*, No. 1:17-CV-1014, 2018 WL 4471732 (M.D.N.C. Sept. 18, 2018), the plaintiff alleged that "she was assigned fewer [TAs] and denied 'the same opportunities to teach graduate courses and seminars as afforded to similarly situated male faculty.'" *Id*. at *5. Here again, Porter has not alleged that he lost staff, has any fewer advisees, or is teaching fewer (or more) classes than before the communications at issue.

Finally, Porter's citation to *Engler v. Harris Corp.*, No. GLR-11-3597, 2012 WL 3745710 (D. Md. Aug. 28, 2012), is materially incomplete. A critical allegation in that case was that the plaintiff had *twice* been placed on a "PIP [performance improvement plan]" by supervisors in response to her complaints of hostile treatment. *Id.* at *3. Porter has not alleged anything of that nature here.

The district court's conclusion that Porter has not plausibly alleged an adverse employment action should be affirmed. That conclusion, on its own, mandates

dismissal of all Porter's claims.[7]

### B. Porter has not plausibly alleged a "but for" causal connection between his speech and any adverse employment action.

The district court also correctly held that Porter's Complaint fails to allege a causal connection between the speech at issue and the alleged adverse employment action, especially in light of the 10-month gap between the Conference Agenda Blog Post and his removal from the Higher Education Program Area. (J.A. 050-051).

"The causation requirement is 'rigorous' in that the protected expression must have been the 'but for' cause of the adverse employment action alleged." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 318 (4th Cir. 2006).

> In retaliation cases, a causal connection may exist where the employer takes adverse employment action against an employee shortly after learning of the protected activity. It follows that "generally the passage of time . . . tends to negate the inference of [causation]." Where a plaintiff rests his case on temporal proximity alone, the temporal proximity must be very close.

*Penley*, 876 F.3d at 656 (cleaned up).

---

[7] Both *amicus curiae* focus their briefs on the "materially adverse employment action" element. In contradiction to settled Fourth Circuit law and seemingly recognizing the speculative nature of Porter's allegations, they urge this Court to hold that the "materially adverse" analysis is a question of fact for a jury, not a question of law. (FIRE Br. at 19-21). The Court should decline to expand the reach of what is "materially adverse," as such a holding would result in a flood of meritless retaliation cases that can only be resolved after expensive and burdensome discovery. *See supra* Section I (citing *Goldstein*, 218 F.3d at 352) (adverse employment action is an issue of law).

Accordingly, this Court has held that an "eight to nine months" gap between the speech and the alleged adverse action is "not very close" and cannot support "but for" causation. *Penley*, 876 F.3d at 656 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (20 months too long for causation); *Booth v. Maryland*, 337 Fed. Appx. 301, 310 (4th Cir. 2009) (per curiam) (nine months too long for causation)). *See also Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (13 months too long for causation); *Pascual v. Lowe's Home Centers, Inc*., 193 Fed. Appx. 229, 233 (4th Cir. 2006) ("three to four months" too long for causation).

While Porter tries to muddy the factual waters in his opening brief, the allegations in his Complaint are clear—the gap between his final communication (the September 3, 2018, Conference Agenda Blog Post) and the first alleged adverse action (his removal from the Higher Education Program Area on July 5, 2019) is 10 months. (J.A. 017, J.A. 023). *Penley*, therefore, controls and mandates affirming the district court.

To avoid that conclusion, Porter makes two arguments. First, he argues *Penley* is distinguishable because in that case there was a "significant intervening event" between the speech and the discipline (i.e., an instance of inappropriate conduct by the plaintiff). (Porter Br. at 27). But that "intervening event" played no role in the court's analysis of temporal proximity with respect to the claim against one of the defendants (Martin). *Penley*, 876 F.3d at 656. To the contrary, the court's holding

- 29 -

focused entirely on the original protected conduct (working on an opposing political campaign). In any event, the contours of Porter's new "significant intervening event" theory are unclear and, more importantly, untethered to any legal authority.

Porter's second argument for why *Penley* should not control relies on narrowing the temporal gap from 10 months to four-and-a-half months. (Porter Br. at 28). He does so by asserting that there was "ongoing controversy over [his] speech" that continued through February 19, 2019, "just 4.5 months" before he was reassigned from the Higher Education Program Area. (*Id.*). But Porter cites no authority (and Defendants are not aware of any) that supports the notion that the triggering date for the speech at issue is tolled so long as there is "ongoing controversy" about that speech.

Porter is correct that, according to the allegations of the Complaint, his treatment of colleagues continued to be an issue during the period between September 3, 2018, and February 19, 2019. It was during this period that Porter cursed at colleagues during a meeting with Pasque, Gayles, and others. (J.A. 018-020). It was also during this period that Porter did not respond to Pasque's request that he try to "repair the relationships" with his colleagues and address with graduate students their concerns about his blog post. (J.A. 020-021). The fact that there was subsequent reaction to the blog post does not change the date on which it was published.

- 30 -

Porter does not allege or argue that he engaged in any protected speech after the September 3, 2018, blog post. And he does not allege or argue that he suffered any materially adverse employment action before July 5, 2019. (J.A. 030) (citing removal from Higher Education Program Area as the first adverse employment action he suffered). Thus the 10-month temporal gap is undisputed.

Porter also argues that he has adequately alleged a causal connection other than temporal proximity. (Porter Br. at 29). In so doing, Porter mischaracterizes the content of his Complaint. Porter attempts in his brief to connect the communications at issue to his alleged concern about a focus on diversity and "social justice." But that discussion is unmoored from the *actual* allegations of the Complaint and the *actual* text of the communications at issue.

As detailed above, Porter's allegedly protected communications say almost nothing about diversity or social justice—the Survey Methodology Comment was focused on the format of a course evaluation question; the Hiring Process Email was a sarcastic broadside fired at a colleague regarding the faculty search she was overseeing; and the Conference Agenda Blog Post, at most, detailed Porter's personal preference regarding a conference agenda while, at the same time, insulting the intelligence of the presenters. (*See supra* Facts Section II A-C).

Because none of the communications at issue was *actually* about diversity or "social justice" or any other issue of public concern, it cannot be the case that

- 31 -

Porter's concerns about diversity or "social justice" were the "but for" cause of his alleged adverse employment actions.

## II. Porter has not adequately pleaded the remaining elements of his claim for First Amendment retaliation.

Even if this Court were to disagree with the district court on *both* the adverse employment action and the causation elements, the dismissal should be affirmed because Porter fails to plead the other elements of his claim. Perhaps sensing the weakness of his claims, Porter preemptively argues in his opening brief that his claims also satisfy *McVey*, even though the district court did not dismiss on that basis. His arguments are unavailing.

### A. The *Garcetti* test controls certain aspects of Porter's claim, and he fails to satisfy it.

Porter contends that *McVey*, not *Garcetti*, provides the "appropriate framework" to analyze this case because it arises in the university context. (Porter Br. at 31) (citing *Adams*, 640 F.3d at 564). Porter's attempt to avoid *Garcetti* is without merit. Because at least two of Porter's statements were made in internal faculty communications on topics that are squarely within Porter's "official duties," *Garcetti* applies.

In *Garcetti*, the Supreme Court held that the "controlling factor" in a First Amendment retaliation claim is not whether the subject matter of the speech was a matter of public concern. 547 U.S. at 421. To the contrary, "when public employees

make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id. See also Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017) (citing *Garcetti*).

The speech at issue in *Garcetti* was an internal disposition memorandum that admittedly (unlike in this case) raised issues of public concern relating to the accuracy of search warrant affidavits. Because Garcetti wrote the memorandum "as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case," it was not protected by the First Amendment. *Id.*

In *Adams*, this Court addressed the question left unanswered by *Garcetti*— i.e., "whether [*Garcetti's*] principles apply in the academic genre where issues of 'scholarship or teaching' are in play." *Adams*, 640 F.3d at 563. The *Adams* Court held that, depending on the faculty member's assigned duties and the facts surrounding the communications at issue, "*Garcetti* may apply to the specific instances of the faculty member's speech carrying out those duties." *Id.* at 563.

While the Court held that the speech at issue in *Adams* fell outside of *Garcetti* because it was not made "pursuant to his official duties," the Court did not create— and has never created—a blanket rule discarding the *Garcetti* principles for all cases arising in the academic setting. *See Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 696 (4th Cir. 2007) ("Thus, [a] school need not tolerate student [or teacher] speech that

is inconsistent with its basic educational mission even though the government could not censor similar speech outside the school.") (alterations in original); *Urofsky v. Gilmore*, 216 F.3d 401, 411 (4th Cir. 2000) (denying that individual professors have a constitutional right to "academic freedom"); *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 369 (4th Cir. 1998) ("Since plaintiff's dispute with the principal, superintendent of schools and the school board is nothing more than an ordinary employment dispute, it does not constitute protected speech and has no First Amendment protection."). *See also Renken v. Gregory*, 541 F.3d 769, 774 (7th Cir. 2008) (applying *Garcetti* to professor's speech regarding misuse of grant funds).

This case demonstrates the exact circumstances, forecast in *Adams*, in which a professor's speech is subject to *Garcetti*. The Survey Methodology Comment and the Hiring Process Email, in particular, relate to Porter's "official duties." Porter admits as much. (J.A. 013) ("Pasque . . . seemed to be trying to establish a paper trail of problematic behavior on his part—behavior that was, in reality, nothing more than doing his job."). These are certainly not issues of "scholarship or teaching" as this Court used those terms in *Adams*. They are instead essentially intra-departmental concerns that would be substantively identical in any other government workplace.

As such, *Garcetti* should apply, and any claims arising from those communications fail as a matter of law.

- 34 -

**B.      Porter fails to satisfy even the *McVey* test because he was not speaking as a citizen on matters of public concern.**

Even under Porter's preferred framework (i.e., *McVey*), Porter's claims also fail as a matter of law because, in making the communications at issue, he was not speaking as a citizen on a matter of public concern but rather as an employee about matters of personal interest.

Porter's speech focused entirely on the minutiae of internal faculty and personal grievances—the survey methodology employed in a course evaluation, the process employed in a hiring search, and his personal preference regarding the agenda for an academic conference—not issues of social justice or diversity. (*See supra* Facts Section II A-C). Settled precedent compels this Court to focus on what Porter actually said, not on what Porter contends he was thinking when he said those things.[8]

In his opening brief, Porter breezes past this prong of *McVey*, relying on a conclusory cite to a 1996 federal district court opinion to support his assertion that the Survey Methodology Comment involved a matter of public concern and failing

---

[8] Recognizing that the facts actually alleged in the Complaint fail to state a claim, Porter opens his "Statement of Facts" with two pages of citations to websites and news articles, but nary a citation to the pleading he filed. (Porter Br. at 2-3). Among other things, Porter references posts from his personal blog that are not alleged anywhere in the Complaint and are therefore inappropriate for consideration at this stage.  *See Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 (D. Md. 1997) (citations omitted), *aff'd*, 141 F.3d 1162 (4th Cir. 1998). This Court should disregard the portions of Porter's brief that stray from the allegations of the Complaint.

to cite any case or make any argument with respect to the Hiring Process Email and the Conference Agenda Blog Post. (Porter Br. at 32-36). In fact, under well-settled Supreme Court and Fourth Circuit precedent, the statements at issue are not matters of public concern.

In answering the question whether employee speech involves a matter of public concern, courts look to "the content, the form, and the context of the speech." *Stroman v. Colleton Cnty. Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992).

> In our inquiry, we seek to determine "whether the 'public' or the 'community' is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a 'private' matter between employer and employee." This is a subtle, qualitative inquiry; we use the content, form, and context as guideposts in the exercise of common sense, asking throughout: would a member of the community be truly concerned with the employee's speech?

*Goldstein*, 218 F.3d at 352–53 (citation omitted).

As the Supreme Court explained in *Connick*, courts should exercise caution in determining what constitutes an issue of public concern because "the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." 461 U.S. at 149. *See also Brooks*, 685 F.3d at 373 ("Were we to constitutionalize poor personal chemistry in the workplace, however, we would, as the district court recognized, elevate the infinitude of worker dissatisfactions with supervisors to a constitutional plane."); *Jurgensen v. Fairfax*

*Cnty., Va*., 745 F.2d 868, 880 (4th Cir. 1984) ("[T]he judgment of the employer is generally to be deferred to where, even if there is a public concern, there is such concern in only 'a most limited sense.'").

In *Connick*,[9] the Court held that, with one exception, an internal questionnaire "soliciting the views of [plaintiff's] fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, [and] the level of confidence in supervisors" did not raise an issue of public concern.[10] *Id.* at 141.

Similarly, in *Brooks*, this Court held that an internal EEO complaint alleging racial and religious discrimination was not an issue of public concern. Among other reasons, the plaintiff in *Brooks* "did not seek to inform the public that [the VDOC officers were] not discharging [their] governmental responsibilities"; the plaintiff did not "seek to bring to light actual or potential wrongdoing or breach of public trust"; and the complaint, "if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo." 685 F.3d at 373 (citing *Connick*, 461 U.S. at 148)). The communications at issue in this case fall squarely within the *Connick/Brooks* line of cases.

On appeal, Porter seeks to reframe his communications as part of "the debate

---

[9] Though it remains the touchstone case on what constitutes an issue of public concern, Porter failed to cite *Connick* in his opening brief.

[10] The one exception was a question regarding "whether employees felt pressured to work in political campaigns." *Id.*

over the extent to which social justice concerns should take priority within academia." (Porter Br. at 2). But as explained below, his Complaint tells a different story.

### i.      The Survey Methodology Comment

The first communication at issue is the comment Porter made in a Spring 2016 faculty meeting regarding the methodology that had been employed in designing a proposed question to be added to student course evaluations. Porter's Complaint is vague as to his exact comment (and the date he made it), though he concedes it embarrassed the professor presenting the proposal and was described as "bullying." *See Brooks v. Univ. of Wisconsin Bd. of Regents*, 406 F.3d 476, 479 (7th Cir. 2005) ("One fundamental problem is that the plaintiffs failed to provide specifics regarding what they said. Instead, they gave only vague descriptions of their speech."). But Porter does not allege that his concerns had anything to do with diversity or "social justice." To the contrary, Porter alleges his comment was focused on "[s]urvey methodology," which is "one of Plaintiff's areas of research." (J.A. 012).

Taking Porter's allegations as true, the survey methodology that was used to design a course evaluation cannot reasonably be considered a matter of public concern, even if the proposed question relates to diversity. It is, instead, just the sort of internal, parochial concern that the public at large would not "be truly concerned with." *Goldstein*, 218 F.3d at 353. Porter does not cite a case supporting that broad

a view of what constitutes an issue of public concern, and Defendants are not aware of one.

### ii.    The Hiring Process Email

The second communication at issue is Porter's April 2018 internal email to his colleagues linking to an article in *Inside Higher Ed* about a faculty search committee at NC State. According to the Complaint, Porter stated: "Did you all see this? . . . This kind of publicity will make sure we rocket to number 1 in the rankings. Keep up the good work, Alyssa!" (J.A. 014-015).

While the Complaint seeks to connect Porter's email to his "broader concern about the abandonment of rigor in pursuit of a particular vision of social justice," Porter's email said nothing of the sort. It simply linked an article and then directed a sarcastic attack at one of his colleagues. (J.A. 015). He did not say a word about diversity, social justice, or academic "rigor" in his email. In fact, the email was so vague that Pasque later asked Porter what his intent was in sending it. Notably, the Complaint indicates that Porter never provided an answer to Pasque's question. (J.A. 015) ("[Pasque] repeatedly asked him what his intent was in sending it.").

Even accepting as true Porter's allegations as to the source of his "concern," his email did nothing to raise or address that concern. Instead, as with the Survey Methodology Comment, Porter used an internal faculty forum to air a sarcastic, personal attack on a colleague. Such a communication is quintessentially *not* an issue

of public concern under controlling precedent. *See, e.g.*, *Brooks*, 685 F.3d at 372

("While Hamlette undoubtedly—and perhaps justifiably—felt slighted by some of

the alleged conduct, a purely personal grievance is not a matter of public concern.").

### iii.    The Conference Agenda Blog Post

The final communication at issue is Porter's September 3, 2018, blog post

entitled "ASHE Has Become a Woke Joke." Porter alleges that the blog "commented

on some research a colleague of his had gathered about topics under discussion at

the upcoming ASHE conference, which demonstrated that the focus of the

conference had shifted from general post-secondary research to a focus on social

justice." (J.A. 017).

But here again, the actual text of his post was far less specific, and it was

devoid of any substantive comment regarding a purported concern with "social

justice." (J.A. 037-038). Porter cites no case in support of his conclusory statement

that the post was "undoubtedly speech on a matter of public concern." (Porter Br. at

36). In fact, while the program agenda for an academic conference may be of concern

to Porter and the conference organizers, it cannot reasonably be characterized as an

issue of public concern, as that term has been defined by this Court.

In substance, Porter's blog post is no different than the "personal grievances"

this Court has made clear are not issues of public concern. *See, e.g.*, *Brooks*, 685

F.3d at 372 ("[W]e conclude that his speech pertained to personal grievances and

complaints about conditions of employment rather than broad matters of policy meriting the protection of the First Amendment."); *Stroman*, 981 F.2d at 157 ("We agree that a personal grievance prompted the letter, which was written in response to a change in the practice of paying teachers in a lump sum for summer work. The substance of the letter, in large part, seems to be limited to this grievance.").

By way of contrast, in *Adams*, the plaintiff's communications—published in books, on television, and on widely read news/commentary websites—were entirely different. *Adams*, 640 F.3d at 554 ("I use my national column (published on TownHall.com and sometimes in Human Events) to help Christian groups fight discrimination."). Significantly, the Court in *Adams* held that the parties did not dispute whether Adams's speech was initially protected by the First Amendment. *Id.* at 561-62. The ultimate issue in *Adams* was whether the plaintiff's speech, protected when initially communicated, lost its First Amendment protections when he subsequently referenced it in his application for promotion (which was denied). *Id.* The Court held that it did not.[11]

\* \* \*

When the Court takes into account "the content, the form, and the context of

---

[11] Ironically, Porter asks this Court to do what it held in *Adams* it cannot do—i.e., to transform unprotected speech into protected speech based on events occurring after the communication. This is particularly true regarding the Conference Agenda Blog Post. Porter relies on the subsequent reaction to his statement, not the statement itself, to support his claim.

the speech" at issue, *Stroman*, 981 F.2d at 156, it fails to meet the standard for an

issue of public concern. In all three cases, the issues *actually* addressed in the text of

Porter's communications are parochial in nature, and they are delivered in the form

of bullying remarks directed to professional colleagues—colleagues whom he was

tasked to work with as part of a practice area. Those attacks may have been

motivated by an (unstated) concern about a purported focus on "social justice," but

that is not what Porter actually said in the communications themselves.

> In public schools and universities across this nation,
> interfaculty disputes arise daily over teaching
> assignments, room assignments, administrative duties,
> classroom equipment, teacher recognition, and a host of
> other relatively trivial matters. A federal court is simply
> not the appropriate forum in which to seek redress for such
> harms.

*Dorsett v. Bd. of Trustees for State Colleges & Universities*, 940 F.2d 121, 123 (5th

Cir. 1991). *See also Colburn v. Trustees of Indiana Univ.*, 973 F.2d 581, 586 (7th

Cir. 1992) ("No doubt the public would be displeased to learn that faculty members

at a public university were evaluating their colleagues based on personal biases.

Nonetheless, the fact that the issue could be 'interesting' to the community does not

make it an issue of public concern."); *Clinger v. New Mexico Highlands Univ., Bd.

of Regents*, 215 F.3d 1162, 1166 (10th Cir. 2000) ("Speech concerning individual

personnel disputes or internal policies will typically not involve public concern.").

For that reason, none of the communications at issue here is entitled to First

Amendment protection.

**C.    The balance of interests favors NC State.**

Porter's allegations also fail the *Pickering* balancing test, which requires the court to "balance 'the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *McVey*, 157 F.3d at 277 (quoting *Pickering*, 391 U.S. at 568). "This is because '[a]s an employer, the government is entitled to maintain discipline and ensure harmony as necessary to the operation and mission of its agencies.'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 246 (4th Cir. 1999) (quoting *McVey*, 157 F.3d at 277). "In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Courts "do not require the public employer to prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was 'reasonably to be apprehended.'" *Smith v. Gilchrist*, 749 F.3d 302, 309 (4th Cir. 2014) (citations omitted).

In *McVey*, the court set forth various illustrative factors relevant to this inquiry. Those factors include whether the employee's speech:

> (1) "impairs discipline by superiors"; (2) impairs "harmony among co-workers"; (3) "has a detrimental

- 43 -

impact on close working relationships"; (4) impedes the performance of the public employee's duties; (5) interferes with the operation of the agency; (6) undermines the mission of the agency; (7) is communicated to the public or to co-workers in private; (8) conflicts with the "responsibilities of the employee within the agency"; and (9) makes use of the "authority and public accountability the employee's role entails."

*McVey*, 157 F.3d at 278 (quoting *Rankin*, 483 U.S. at 388–91).

Based just on the allegations of the Complaint, the balance of interests in this case weighs heavily in favor of NC State. The Complaint is replete with allegations demonstrating the deleterious effect Porter's personal attacks had on the department.

- In a run-of-the-mill meeting regarding the potential hiring of a new professor and the creation of a new Program Area, Porter lashed out in anger, telling his colleagues to "[g]ive [him] a fucking break." (J.A. 019-020);

- Despite a request by Pasque (his superior), Porter did not meet with students who were upset by his blog post to discuss their concerns (J.A. 021-022);

- Porter's April 2016 confrontation with a colleague in a faculty meeting regarding survey methodology was "embarrassing for [the colleague]" and was described by witnesses as "bully[ing]" (J.A. 012-013);

- Porter's April 2018 personal attack on his colleague who was conducting an employment search process was extremely upsetting to Porter's colleagues, causing them to express their concern to Pasque (J.A. 015-016);

- Porter's denigration of the intelligence of the presenters at the ASHE conference ("I prefer conferences where . . . the attendees and presenters are smarter than me," (J.A. 037-038)) drew criticism from graduate students at NC State. (J.A. 021).

These facts and others—each drawn from the Complaint—satisfy almost all of the factors set forth in *McVey*. By his own admission, Porter's public and private interactions reflected a disdain for his superiors and colleagues, caused substantial disharmony among the higher education faculty, impacted his working relationships with colleagues and students, and undermined the work and reputation of the department. Balanced against all of these facts are three communications that, as detailed above, focused entirely on private, internal issues such as survey methodology, a hiring process, and the schedule at a higher education conference.

Porter may have thought he was talking about the department's purported focus on "social justice," but the words he actually used—and harshly so—were aimed at far more banal concerns. Those concerns do not outweigh NC State's interests. *See Joyner v. Lancaster*, 815 F.2d 20, 24 (4th Cir. 1987) ("To the extent that a public employee's expression is in furtherance of matters of personal concern, the public employer's burden of showing the predominance of the public's interest in continuing the efficient functioning of a public entity is lessened.").

### D. Porter otherwise fails to state individual capacity claims against the BOT and Woodson.

In addition to the reasons detailed above, Porter's claims against Chancellor Woodson and the BOT fail because the Complaint does not identify a single action that Chancellor Woodson or the BOT took, or any decision they made, much less

any action or decision that harmed Porter. In fact, Chancellor Woodson and the BOT are each mentioned once in the Complaint (solely to identify them as Defendants (J.A. 008)), and they are not mentioned at all in Porter's opening brief.

Under controlling Fourth Circuit precedent in a First Amendment retaliation case, Porter must allege some concrete action by each defendant to state a claim against that defendant. *See, e.g.*, *Penley*, 876 F.3d at 655 ("Appellant has not offered even a mere scintilla of evidence that Neighbors or Gillespie caused his alleged adverse employment action.") (citing *Constantine*, 411 F.3d at 499 ("A plaintiff seeking to recover for First Amendment retaliation must allege that . . . *the defendants took some action* that adversely affected her First Amendment rights....") (emphasis added in *Penley*)); *Goldstein*, 218 F.3d at 352.

Without *any* such allegation against Chancellor Woodson or the BOT, Porter's claims against them are frivolous and were properly dismissed.

## III. In the alternative, Porter's claims against the individual Defendants in their individual capacities are barred by qualified immunity.

The district court correctly held, in the alternative, that the individual-capacity Defendants are entitled to qualified immunity both because Porter has not stated a valid claim for a constitutional violation and because Porter could not establish a "clearly established" right under the alleged facts. (J.A. 051-052). These rulings should be affirmed.

Qualified immunity shields government officials from personal-capacity

claims for money damages under Section 1983, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ridpath*, 447 F.3d at 306 (citations omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).

In Section 1983 cases, government officials are entitled to qualified immunity unless the claim satisfies a two-prong test: "(1) the allegations underlying the claim, if true, substantiate the violation of a federal statutory or constitutional right; and (2) this violation was of a 'clearly established' right 'of which a reasonable person would have known.'" *Ridpath*, 447 F.3d at 306 (citations and quotations omitted). Porter's claims fail to satisfy either prong of this test.

First, as detailed above, Porter has failed to state a valid claim for First Amendment retaliation, so there is no violation of Porter's rights.

Second, even if he had stated a claim, the right at issue was not "clearly established." In order to hold that a right is clearly established, a court does not need to find "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "The qualified immunity inquiry depends on the official's

'perceptions at the time of the incident in question.'" *Crouse*, 848 F.3d at 583 (quoting *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994)).

This Court has "recognized that in [First Amendment retaliation] cases only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' that is subtle, yet difficult to apply, and not yet well defined." *Pike v. Osborne*, 301 F.3d 182, 185 (4th Cir. 2002) (internal quotation marks omitted) (citing *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir.1995); *McVey*, 157 F.3d at 277). *See also Kirby v. City Of Elizabeth City, N. Carolina*, 388 F.3d 440, 451 (4th Cir. 2004) ("[T]he legal viability of the claim presents a close and novel issue, and even assuming that Kirby's allegations are true, Hampton and Koch cannot be held liable for what would amount to 'bad guesses in [a] gray area [ ].'") (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir.1992)).

In this case, even if *arguendo* the court were to find that Porter has adequately alleged a constitutional violation, the facts and law detailed above cannot reasonably be understood to support a "clearly established right." *Ridpath*, 447 F.3d at 306.

Porter seeks to turn *Pike* on its head, arguing that because the *Pickering* balancing test is "fact-driven," the court should avoid ruling on qualified immunity at the Rule 12 stage. (Porter Br. at 40). But, as the district court correctly recognized, the "fact-driven" nature of the *Pickering* balancing test is *exactly* why it is

exceedingly rare to find "clearly established" law in First Amendment retaliation cases.[12]

Porter relies largely on *Adams*, but the facts of that case are wholly distinguishable from the facts alleged here. In *Adams*, an adverse employment action—failure to give a promotion—was undisputed. 640 F.3d at 555. Not so here. There, the speech at issue—free speech and free exercise on university campuses—addressed issues of public concern, and the only question was whether *Garcetti* foreclosed Adams's claims. *Id.* at 561. Not so here. There, causation was not at issue. Not so here. As a result, the district court correctly held that there is no case "where on similar facts a court concluded that the constitutional or statutory right was clearly established." (J.A. 052).

The other cases Porter relies on do not advance his argument. First, Porter cites a handful of out-of-circuit district court cases, which are insufficient to "clearly establish" the law in the Fourth Circuit. (Porter Br. at 39).

Porter's discussion of the Supreme Court's recent opinion in *Mahanoy Area Sch. Dist. v. B. L.*, 141 S. Ct. 2038 (2021), is also inapposite. First, and most obvious, that case was decided in June 2021, several years *after* the events at issue in this

---

[12] To be sure, the nature of the *Pickering* analysis properly gives courts pause in ruling on a Rule 12 motion, especially where the outcome turns on that element. Here, however, Porter's claims fail at every step of the analysis, including with respect to the balance of the interests.

case, so it is no help in deciphering what was "clearly established" in 2019. Second, the Court's extended analysis of the constitutional status of on-campus and off-campus speech demonstrates conclusively that the context of the speech at issue was an unsettled legal question in 2019 (and remains so today). *Id.* at 2053-2057. Finally, the facts in *Mahanoy* are distinguishable as that case involved a claim brought by a high school student, not a university employee. *Id.* at 2042.

Ultimately, Porter's argument relies on a mischaracterization of the district court's holding, contending that the outcome was predicated on the fact that the Conference Agenda Blog Post was published on a personal blog. (Porter Br. at 40-41). In fact, the district court did just as it was required to do—it analyzed "the content, the form, and the context of" all three communications, *Stroman*, 981 F.2d at 156, and held that Porter's speech was materially different than the speech in *Adams*. (J.A. 052). As demonstrated above, that conclusion is compelled by the law and the facts alleged by Porter.

As a result, the individual-capacity Defendants are entitled to qualified immunity.

**IV.    Porter's claims for monetary damages against all Defendants in their official capacities are barred by sovereign immunity and the Eleventh Amendment.**

The district court held that Porter's official-capacity claims for money damages against the BOT and the individual Defendants were barred by sovereign

and Eleventh Amendment immunity. (J.A. 046). Porter does not dispute that holding

in his opening brief, and, as a result, any such argument is waived. *See supra* n.6.

## V. Porter's request for an injunction permitting him to join the Higher Education Access, Equity, and Justice Program Area of Study is not prospective relief under *Ex parte Young*.

Porter challenges the district court's determination that his request for an

injunction permitting him to join the new Higher Education Access, Equity, and

Justice Program Area of Study is not prospective relief under *Ex parte Young*, 209

U.S. 123 (1908). Porter's argument is without merit.

*Ex parte Young* provides a limited exception to Eleventh Amendment

immunity in Section 1983 claims where suit is brought against state officials and

"(1) the violation for which relief is sought is an ongoing one, and (2) the relief

sought is only prospective." *Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (4th

Cir.1998). The *Ex parte Young* exception "does not permit federal courts to entertain

claims seeking retrospective relief, either compensatory or other, for completed, not

presently ongoing violations of federally protected rights." *Id.*

Ongoing violations do not exist when a claim seeks redress only for

consequences of alleged past actions which may still persist. *See, e.g.*, *Green v.

Mansour*, 474 U.S. 64, 73 (1985) (holding that a State is immune from declaratory

judgments that would provide retrospective relief); *Jemsek v. N.C. Med. Bd.*, No.

5:16-CV-59-D, 2017 WL 696721, at *6 (E.D.N.C. Feb. 20, 2017) (holding that a

doctor's request for injunctive relief directing a state medical board to retract a disciplinary order did not satisfy *Ex Parte Young*), *affirmed by* 697 F. App'x 234 (4th Cir. 2017).

Here, Porter alleges that his request for an injunction requiring NC State to allow him to join the new Program Area of Study is "like a request for an injunction ordering reinstatement to a job, a request for prospective relief." (Porter Br. at 37). In support of this argument, Porter cites only an unpublished district court opinion. Porter's argument does not withstand scrutiny.

With respect to the alleged non-invitation to the Higher Education Access, Equity, and Justice Program Area of Study, there is no ongoing violation. If the allegations of the Complaint are to be believed, Porter was not invited to the new Program Area of Study; at that point, the alleged violation was complete, and any request for an injunction remedying that lack of an invitation is simply seeking redress of a past violation.

By its plain meaning, the term "reinstatement" does not apply to Porter's request for an invitation to the new Program Area of Study because he was never in the new Program Area of Study. *See* BLACK'S LAW DICTIONARY (11th ed. 2019) ("[R]einstate . . . To place again in a former state or position; to restore <the judge reinstated the judgment that had been vacated>.").

Moreover, there is an obvious distinction—factually, legally, and logically—

between an injunction returning Porter to the Program Area he was in before the events at issue in the lawsuit (i.e., the status quo ante), and an injunction requiring Defendants to provide Porter with a new position he did not hold before the events at issue in the lawsuit. It is akin to the difference between a prohibitory injunction and a mandatory injunction. *Cf. League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) ("Whereas mandatory injunctions alter the status quo, prohibitory injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending.") (citation and quotation omitted). True reinstatement simply returns the parties to the status quo ante; Porter's request would *change* the status quo ante and is beyond the reach of *Ex parte Young*.

To be clear, however, even if Porter's request for an invitation to the new Program Area of Study were prospective under *Ex parte Young*, the claim would fail for the reasons detailed above.

## <u>CONCLUSION</u>

Defendants-Appellees respectfully request that the Court affirm the district court's order.

- 53 -

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to Fed. R. App. P. 34(a)(3), oral argument should be denied because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. However, Appellees welcome oral argument if the court would find it helpful to clarify any issue presented in the appeal.

Respectfully submitted, this 26th day of September, 2022.

BROOKS, PIERCE, MCLENDON,
 HUMPHREY & LEONARD, LLP

/s/ Eric M. David
Eric M. David
N.C. State Bar No. 38118
Post Office Box 1800
Raleigh, North Carolina 27602
edavid@brookspierce.com

JOSHUA H. STEIN
Attorney General

/s/ Kari R. Johnson
Kari R. Johnson
Special Deputy Attorney General
N.C. State Bar No. 16033
kjohnson@ncdoj.gov

/s/ Vanessa N. Totten
Vanessa N. Totten
Special Deputy Attorney General
N.C. State Bar No. 29705
vtotten@ncdoj.gov

N.C. DEPARTMENT OF JUSTICE
P. O. Box 629
Raleigh, North Carolina 27602-0629
Telephone: (919) 716-6920
Fax: (919) 716-6764

*Attorneys for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,980 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman and 14-point font.

Dated:   September 26, 2022          /s/ Eric M. David
                                     Eric M. David
                                     N.C. State Bar No. 38118

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 26th day of September 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

Jonathan A. Vogel
VOGEL LAW FIRM PLLC
6000 Fairview Road
South Park Towers, Suite 1200
Charlotte, NC 28210

Kathryn D. Valois
PACIFIC LEGAL FOUNDATION
4440 PGA Boulevard, Suite 307
Palm Beach Gardens, FL 33410

Ethan W. Blevins
Daniel M. Ortner
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, CA 95814

Samantha K. Harris
ALLEN HARRIS LAW
PO BOX 673
Narberth, PA 19072

Darpana M. Sheth
Jeffrey D. Zeman
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
510 Walnut Street, Suite 1250
Philadelphia, PA 19106

JT Morris
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Suite 340
Washington, DC 20003

/s/ Eric M. David
Eric M. David
N.C. State Bar No. 38118
Post Office Box 1800
Raleigh, North Carolina 27602
edavid@brookspierce.com